194 Cal.App.3d 1006 (1987)
240 Cal. Rptr. 84
Estate of RAYMOND H. LUKE, Deceased.
CYNTHIA MAGGIO, Petitioner and Appellant,
v.
VERA LaVAUN VAHLDIECK, as Acting Administrator, etc., Claimant and Appellant.
Docket No. B020251.
Court of Appeals of California, Second District, Division Seven.
September 15, 1987.
*1009 COUNSEL
Sullivan & Swick, Ted Sullivan and James E. Swick for Petitioner and Appellant.
Lynard C. Hinojosa for Claimant and Appellant.
OPINION
JOHNSON, J.
This is an appeal and cross-appeal from a judgment determining heirship in which the court apportioned the estate of Raymond *1010 Luke between his heirs and the heirs of his predeceased spouse, Catherine Luke. We affirm in part and reverse in part.

FACTS AND PROCEEDINGS BELOW
The parties stipulated to the following facts.
Raymond and Catherine Luke were married in Illinois in 1926. They moved from Illinois to Iowa in 1937 and resided there until Catherine's death in 1978. Soon after, Raymond moved to California where he died intestate in 1984. Between the date of Catherine's death and his own, Raymond was not employed nor did he receive any gifts or inheritances.
Catherine's estate was probated in Iowa and the probate file was received in evidence in the case before us. The record shows the following assets: a 40-acre farm (the separate property of Catherine disposed of by will) and property held in joint tenancy with Raymond; a home in Carroll County Iowa valued at $30,000; Series E savings bonds valued at $25,588; time certificates valued at $80,856.[1]
There were no children of the marriage. The dispute before us is between Raymond's and Catherine's nieces and nephews all seeking to inherit under California's intestate succession law.
The trial court found Raymond's estate included former community property and Raymond's separate property. The community property consisted of the savings bonds and the unpaid balance on the contract for sale of the Lukes' home in Carroll County Iowa. Raymond's separate property constituted the remainder of the estate, including the time certificates and uncashed checks representing proceeds from the certificates and the sale of the Lukes' home. Pursuant to former section 229 of the Probate Code,[2] the court awarded one-half of the former community property to Catherine's heirs and the other one-half of the community property, plus the separate property, to Raymond's heirs. Neither side is satisfied. Each contends the award to the other is not supported by substantial evidence.

DISCUSSION
This is not a simple sufficiency-of-the-evidence case however. To decide this appeal we must unravel a snarl of conflicting presumptions and cases *1011 reaching apparently inconsistent conclusions about how section 229 should be applied. The task is not an easy one.
In an article in the Hastings Law Journal Professor Russell Niles described the ideal statute on intestate succession as one that "should be clear and simple ... comprehensible to any intelligent person and should provide for a distribution that the average decedent probably would have wanted if an intention had been expressed by will." (Niles, Probate Reform in California (1979) 31 Hastings L.J. 185, 200.) Professor Niles held up sections 228 and 229 as the bad example of intestate succession law. "These sections, persistently amended and enlarged, have become too complex and difficult to apply. Any attempt through intestate succession statutes to create the refined and esoteric distinctions found in sections 228 and 229 is bound to create uncertainty and may lead to capricious results." (Id., at p. 207.) Despite this dire prediction of the outcome of our efforts, we proceed to decide this case based on what we perceive to be the applicable law and legislative intent.

A. Applicable Principles of Succession under Section 229

(1) Because Raymond died intestate, his estate is distributed according to the laws of intestate succession in effect at the date of his death, July 12, 1984. (§ 300; Estate of Macmillan (1954) 43 Cal.2d 437, 442 [274 P.2d 662].) In this case, Catherine's heirs are claiming an interest in Raymond's estate under section 229 as it existed on July 12, 1984. At that time section 229 provided in relevant part: "(a) If the decedent leaves no living spouse or issue and there are issue of the decedent's predeceased spouse, the portion of the decedent's estate attributable to the decedent's predeceased spouse shall go in equal shares to the children of the predeceased spouse and to their descendants by right of representation, and if none, then to the parents of the predeceased spouse, in equal shares, or if either is dead to the survivor, or if both are dead, in equal shares to the brothers and sisters of the predeceased spouse and to their descendants by right of representation.
"(b) For the purposes of this section, the `portion of the decedent's estate attributable to the decedent's predeceased spouse' shall mean: (1) One-half of the community property in existence at the time of the death of the predeceased spouse.
"(2) One-half of any community property, in existence at the time of death of the predeceased spouse, which was given to the decedent by the predeceased spouse by way of gift, descent, devise, or bequest.
*1012 "(3) That portion of any community property in which the predeceased spouse had any incident of ownership and which vested in the decedent upon the death of the predeceased spouse by right of survivorship.
"(4) That portion of any property which, because of the death of the predeceased spouse, became vested in the decedent and was set aside as a probate homestead.
"(5) Any separate property of the predeceased spouse which came to the decedent by gift, descent, devise, or bequest of the predeceased spouse or which vested in the decedent upon the death of the predeceased spouse by right of survivorship."[3]
(2) Pursuant to the provisions of section 229, where, as here, the decedent dies without leaving a spouse or issue, the former community property passes one-half to the heirs of the predeceased spouse and one-half to the decedent's heirs. All of the decedent's separate property goes to his heirs. This legislative scheme was devised to allow the relatives of the predeceased spouse and the relatives of the decedent to share the former community property since both the predeceased spouse and the decedent contributed equally to its acquisition. (Estate of Abdale (1946) 28 Cal.2d 587, 590 [170 P.2d 918].)
In this case, all of the assets in Raymond's estate were originally acquired in Illinois and Iowa and were brought into California after Catherine's death when Raymond moved his residence to California. (3) The parties agree that for purposes of succession the courts can reclassify personal property brought into California as separate or community just as if it had been acquired in California. (Estate of Perkins (1943) 21 Cal.2d 561, 570 [134 P.2d 231].)
(4) In order to share in Raymond's estate, Catherine's heirs have to establish first, what, if any, community property existed at the time of Catherine's death; second, what, if any, of that community property can be traced into Raymond's estate. (Estate of Adams (1955) 132 Cal. App.2d 190, 196, 204 [282 P.2d 190].) Catherine's heirs may use the applicable presumptions in meeting their burden of proof. (Id., at p. 204.)
If the source of the assets in Raymond's estate was community property, then Catherine's heirs are entitled to share in the assets regardless of the fact the assets were held by Catherine and Raymond as joint tenants. *1013 (Estate of Taitmeyer (1943) 60 Cal. App.2d 699, 712 [141 P.2d 504].) If the source of the assets was Raymond's separate property, Catherine did not acquire a separate property interest merely because Raymond transferred the property into joint tenancy. (Estate of Abdale, supra, 28 Cal.2d at pp. 592-593.)

B. Contentions of the Parties

1. Community property issue

Catherine's heirs contend they met their burden of proof as to community property existing at the time of Catherine's death because they proved all the property existing at the time of her death was acquired during the marriage and Raymond's heirs failed to rebut the presumption property acquired during a marriage is community property. (Civ. Code § 5110.)
Raymond's heirs contend the community property presumption is not applicable to this case because the property at issue was held in joint tenancy. Even if the community property presumption is applicable it is rebutted, as to the savings bonds and time certificates, by Raymond's affidavit claiming his separate property was the source of these assets.

2. Tracing issue

(5a) Catherine's heirs contend they met their burden of proof tracing the community property to Raymond's estate because: all the property was community property at Catherine's death; Raymond died only a few years after Catherine; Raymond had no significant source of income in the intervening years.
Raymond's heirs contend the presumption the property found in the estate of the surviving spouse is his separate property cannot be rebutted by mere inferences drawn from the existence of community property, proximity of the spouses' deaths and Raymond's heirs failure to produce evidence of the source of the assets in the estate. In addition they point out Raymond's estate includes six time certificates in the amount of $41,000 which were issued after Catherine's death. (See fn. 1, ante.)

C. The Evidence Establishes the Home, Savings Bonds and Time Certificates Owned by Catherine and Raymond at Catherine's Death Were Community Property

Evidence admitted at the hearing showed at the date of her death, Catherine owned, as joint tenant with Raymond, a home in Carroll County, *1014 Iowa, Series E Savings Bonds and time certificates. All this property was acquired during her marriage to Raymond. (6) It is presumed property acquired during marriage is community property. (Civ. Code, § 5110; Estate of Adams, supra, 132 Cal. App.2d at p. 197.) Although this presumption is no longer considered evidence (Evid. Code, § 600, subd. (a)) it establishes a prima facie case for Catherine's heirs and shifts the burden of proof to Raymond's heirs to establish the property was Raymond's separate property. (Evid. Code, § 605; Estate of Adams, supra, 132 Cal. App.2d at p. 197; cf. Estate of Duncan (1937) 9 Cal.2d 207, 217 [70 P.2d 174].)
(7a) As previously noted, Raymond's heirs contend the community property presumption does not apply where the property was held in joint tenancy. (8a) They further contend Raymond's affidavit submitted in Catherine's probate proceeding rebuts the community property presumption.
There are cases holding the community property presumption does not apply when property is acquired by a married couple as joint tenants. Instead, the presumption is the ownership interest in the property is as stated in the title to it. (See, e.g., Estate of Cline (1963) 214 Cal. App.2d 152, 155 [29 Cal. Rptr. 495]; Edwards v. Deitrich (1953) 118 Cal. App.2d 254, 260 [257 P.2d 750]; Siberell v. Siberell (1932) 214 Cal. 767, 772 [7 P.2d 1003]; Estate of Levine (1981) 125 Cal. App.3d 701, 705 [178 Cal. Rptr. 275].) Except for Estate of Cline, none of these cases involved intestate succession. On the other hand there are numerous cases, including Estate of Cline, supra, 214 Cal. App.2d at page 153, holding the character of property, for purposes of sections 228 and 229 depends on its source, not the nature of the title in which it is held. (See, e.g., Estate of Riley (1981) 119 Cal. App.3d 204, 209 [173 Cal. Rptr. 813]; Estate of Reizian (1951) 36 Cal.2d 746, 749 [227 P.2d 249]; Estate of Abdale, supra, 28 Cal.2d at pp. 590-591; Estate of Taitmeyer, supra, 60 Cal. App.2d at p. 712.)
In Estate of Riley the court explained, "[T]he Legislature, in sections 228 and 229, furnished a general plan of distribution based upon the underlying fundamental principle that the origin or source of the property should determine its distribution. [Citation omitted.] Where property has been placed in joint tenancy, as was done here, this principle requires that the court look beyond the character of the property immediately preceding its transfer to the surviving spouse, and instead focus on the character of the property before it was placed in joint tenancy." (119 Cal. App.3d at p. 209; italics added.) The "source" rule is consistent with the Legislature's intent "the community property of the spouses should be shared equally by the relatives of the predeceased spouse and the relatives of the surviving spouse *1015 since both spouses are deemed to have contributed equally to its acquisition...." (Estate of Rattray (1939) 13 Cal.2d 702, 713 [91 P.2d 1042].)
(7b) We conclude the community property presumption, not the form-of-the-title presumption, should apply in cases arising under former section 229. The community property presumption is consistent with the rule courts must look to the source of the property before it was placed in joint tenancy and consistent with the legislative intent that intestate succession should reflect the decedent's contribution to the estate. (Estate of Perkins, supra, 21 Cal.2d 561, 569-570.)
It is also consistent with what the "average decedent would have wanted if an intention had been expressed by will." (Niles, supra, 31 Hastings L.Rev. at p. 200.) Catherine, presumably, would have preferred her estate go to her blood relatives rather than her in-laws. Raymond, if he disagreed with this result, could have avoided the operation of section 229 by simply making a will. (Estate of Taitmeyer, supra, 60 Cal. App.2d at p. 711.)
The primary reason for the use of joint tenancy is its survivorship feature. (Griffith, Community Property in Joint Tenancy Form (1961) 14 Stan.L.Rev. 87, 90; Siberell v. Siberell, supra, 214 Cal. at p. 773; Estate of Levine, supra, 125 Cal. App.3d at p. 703.) It is commonly believed holding property in joint tenancy will allow the surviving spouse to avoid probate when her partner dies. Our decision in this case will not interfere with that expectation. Giving affect to the community property presumption when there is no surviving spouse does not defeat the spouse's purpose in holding the property in joint tenancy. That purpose, avoiding probate, was accomplished in so far as it could be when the first spouse died. Nor is our decision inconsistent with In re Marriage of Lucas (1980) 27 Cal.3d 808 [166 Cal. Rptr. 853, 614 P.2d 285], and other Supreme Court decisions holding the form-of-the-title presumption cannot be overcome "`solely by evidence as to the source of the funds used to purchase the property.'" (Id., at p. 813.) The rationale behind the form-of-the-title presumption was explained in Lucas: "The act of taking title in a joint and equal ownership form is inconsistent with an intention to preserve a separate property interest. Accordingly, the expectations of parties who take title jointly are best protected by presuming that the specified ownership interest is intended in the absence of an agreement or understanding to the contrary." (Id., at p. 815.) That rationale does not apply to cases of intestate succession where there is no surviving spouse or child. A different rationale, explained by the Supreme Court in Estate of Abdale, supra, 28 Cal.2d at page 590 applies: "After reviewing the history of sections 228 and 229, in Estate of Rattray, [supra, 13 Cal.2d 702], this court stated: `"It is apparent from the history of these code provisions and the various changes therein that ever since the amendment in 1905 [Stats. 1905, *1016 p. 608], wherein the origin or source of the property was first set up as one of the determining factors in the descent and distribution of the estate of a decedent dying intestate without issue, that there has been a consistent attempt to work out a reasonable, consistent scheme of distribution wherein upon the death of a decedent intestate without issue, instead of the whole property going to the relatives of the last surviving spouse, the property should go back to the relatives of the spouse from which title was derived. The scheme in general, as was fair and reasonable, provided that the separate property of a predeceased spouse should go back in its entirety to the relatives of said predeceased spouse, and that the community property of the spouses should be shared equally by the relatives of the predeceased spouse and the relatives of the surviving spouse since both spouses are deemed to have contributed equally to its acquisition.... It will be noted that the provisions relative to the separate property of the predeceased spouse and relative to the community property of the spouses ... were intended to furnish one general plan of distribution based upon the same underlying fundamental principle, that the origin or source of the property should determine its distribution."'"
Estate of Brenneman (1958) 157 Cal. App.2d 474 [321 P.2d 86] involved facts similar to those in the case before us. Mr. and Ms. Brenneman married in Pennsylvania in 1908. In 1923 they moved to California and in 1926 Mr. Brenneman acquired real property in his name as a married man. In 1928 Mr. and Ms. Brenneman deeded this property to a third party who, a few months later, deeded it back to them as joint tenants. Mrs. Brenneman predeceased her husband. Upon his death, intestate, their respective heirs contested the status of the property in Mr. Brenneman's estate. The trial court ruled all the property was community property except for the real estate held in joint tenancy. The appellate court reversed as to the real estate. The court cited the community property presumption and found the evidence was all to the effect the property in Mr. Brenneman's estate was acquired during the marriage or had its source in property so acquired. (Id., at pp. 477, 479.) Because there was no evidence the real estate was acquired with Mr. Brenneman's separate property the fact he took title in his name alone and later transferred title to himself and his wife as joint tenants did not overcome the presumption the source of the asset was community property.
(8b) Similarly, in our case, all the property owned by the Lukes at Catherine Luke's death was property acquired during the marriage. This included real estate in Carroll County, Iowa. This real estate was originally acquired in the name of Raymond Luke only. A few days later, the property was conveyed to Raymond and Catherine Luke "husband and wife as joint tenants...." In accordance with the ruling in Brenneman, which we *1017 believe was correct, the Carroll County real estate as well as the savings bonds and time certificates should be held to be community property because they were acquired with community assets even though title was taken in joint tenancy.
We conclude Catherine's heirs were entitled to rely on the community property presumption and the burden shifted to Raymond's heirs to prove property owned by the Lukes at Catherine's death had it source in Raymond's separate property. In attempting to meet this burden of proof, Raymond's heirs introduced an affidavit Raymond filed in Catherine's probate proceeding in which Raymond claimed the savings bonds and time certificates were his separate property traceable to funds he received from the sale of a business he owned prior to marrying Catherine. Catherine's heirs objected to the introduction of this evidence on the ground it was self-serving and hearsay.
(9) The fact the affidavit was self-serving did not make it inadmissible. (See 1 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 15.2, p. 408.) However, the affidavit should not have been admitted because it did not meet the criteria for an exception to the hearsay rule under Evidence Code section 1261, subdivison (a). That section provides "Evidence of a statement is not made inadmissible by the hearsay rule when offered in an action upon a claim or demand against the estate of the declarant if the statement was made upon the personal knowledge of the declarant at a time when the matter had been recently perceived by him and while his recollection was clear."
Raymond's statement lacks the safeguard that it be made at a time when the matter had recently been perceived by the declarant and while his recollection was clear. Raymond's statement describes events which took place over a period of 40 years beginning when Raymond sold his drug business in 1936. Raymond's recollection of how he handled the proceeds of the sale is not the recollection of a recently perceived event nor was there any evidence Raymond had a clear recollection of these events when he wrote the affidavit. Therefore, the court erred in admitting Raymond's affidavit.
(8c) Even if Raymond's declaration was properly admitted it did not rebut the presumption the subject assets were community property. According to the declaration, Raymond continued to manage his drug business for 10 years after his marriage to Catherine. He used the proceeds from the sale of the drug business to buy a farm in Iowa where he and Catherine lived and worked from 1937 to 1969. Raymond and Catherine purchased a home in Carroll, Iowa, with "the earnings from the farm and other savings [Raymond] was able to accumulate through the years." During the marriage *1018 Catherine received rental income from a farm that was her separate property. She used all this money to buy her own clothing and other personal items and to pay doctor bills.
The fact Raymond brought separate property to the marriage in 1926 does not rebut the presumption property purchased during the marriage is community property. (10) "Generally speaking, there are two methods of carrying the burden of showing property purchased during the marriage to be separate: (1) direct tracing to a separate property source or (2) proof that at the time of purchase all community income was exhausted by family expenses." (Estate of Murphy (1976) 15 Cal.3d 907, 918 [126 Cal. Rptr. 820, 544 P.2d 956].) (8d) Raymond's affidavit makes neither showing. Because Raymond managed the drug business for 10 years after the marriage some portion of the sale price was community property. (Beam v. Bank of America (1971) 6 Cal.3d 12, 18 [98 Cal. Rptr. 137, 490 P.2d 257].) There is no way of calculating the community property allocation from the information in Raymond's affidavit. Furthermore, the proceeds from the sale of the drug business were not kept separate. According to Raymond's affidavit they were commingled with earnings from the farm and savings accumulated through the years. Finally, it is clear from Raymond's affidavit all community income was not exhausted by family expenses. Not only were savings accumulated but Catherine paid for much of her own needs out of her separate property.
(11) The presumption in favor of community property applies to commingled property so that the burden of proof rests with the party claiming the property to be separate. (Estate of McGee (1959) 168 Cal. App.2d 670, 677 [336 P.2d 622].) In a recent case involving a dispute over what was separate and what was community property we held, "The exact amount of money allocable to separate property and the exact amount of money allocable to community property must be ascertained before it can be said the money allocable to separate property is not so commingled that all funds in the account are community property." (In re Marriage of Frick (1986) 181 Cal. App.3d 997, 1011 [226 Cal. Rptr. 766].) Raymond's heirs have failed to produce any evidence supporting an allocation to Raymond's separate property.
To summarize, the evidence supports a finding at Catherine's death the community property consisted of the Series E savings bonds, real property in Carroll County, and time certificates purchased between 1963 and 1978.

D. Catherine's Heirs Met the Burden of Tracing Raymond's Savings and Loan Accounts to Community Property

Raymond's heirs concede the Series E bonds and the real estate sale contract for the sale of the Carroll County property were traced from *1019 Raymond and Catherine's community property to Raymond's estate.[4] The dispute is over tracing the various savings and loan accounts in Raymond's estate to community property sources. The trial court found the assets to be separate property on the ground Catherine's heirs had not proved the contrary.
Catherine's heirs bear the burden of proving the property in Raymond's estate had its source in community assets. (12) In doing so, they must overcome the presumption the property in the estate of the surviving spouse is the separate property of the surviving spouse. (Estate of Adams, supra, 132 Cal. App.2d at p. 203.) In Estate of Adams the court explained one method for successfully tracing assets. "[I]f the first spouse dies after a long married life, and shortly thereafter the surviving spouse dies, there being no evidence that the surviving spouse was gainfully employed, the inference that the property was community will support the finding to that effect. [Citation omitted.] Evidence that the surviving spouse over a [short] period received no gift or income that could be characterized as separate will support the inference that the property that was community on the death of the predeceased spouse remained such until the death of the surviving spouse." (Id., at p. 205.) This does not require the heirs of the predeceased spouse to find the identical property in the estate of the surviving spouse, only to trace the source of the surviving spouse's property to community property. (Id., at p. 203; and see Estate of Jolly (1925) 196 Cal. 547, 556 [238 P. 353].)
This tracing method was used by the appellate courts in Estate of Jolly and Estate of Brenneman, supra, 157 Cal. App.2d 474, both of which reversed the trial court's finding the property in the surviving spouse's estate was the separate property of the surviving spouse.
In Estate of Jolly the spouses were married 40 years. John Jolly died in 1912; Margaret Jolly died 10 years later. It was stipulated Margaret never worked outside the home. The Supreme Court first applied the community property presumption to establish the assets acquired during the Jollys' marriage were community property. It then concluded, contrary to the trial court, the assets in Margaret's estate must have derived from community property. This conclusion was "compelled ... by the process of elimination." (196 Cal. at p. 555.) "[E]very possible method or means by which the property in question could have been acquired by the wife since the husband's death has been stipulated out of the case, except the bare possibility of gift, devise, bequest or descent. There is no evidence tending to show or *1020 presumption of law tending to support a claim that she acquired any property [by gift, devise, bequest or descent]." (Id., at pp. 553-554.)
In Estate of Brenneman the spouses were married 45 years. They died three years apart. There was no evidence the surviving spouse acquired any property that could be characterized as separate property after the other spouse's death. The trial court concluded all the surviving spouse's assets were traced to community property except for a parcel of real property. The appellate court reversed as to the real property on the ground the trial court's finding it was separate property was without support given the length of marriage, proximity of death and lack of evidence of income of the surviving spouse. (157 Cal. App.2d at pp. 475-477, 482.)
(5b) In the case before us, Raymond and Catherine were married 52 years. They died six years apart. At his death, Raymond possessed cash assets of $224,722 in various banks and savings and loan institutions. Catherine's heirs traced these assets to Catherine and Raymond's community property by the process of elimination. (Estate of Jolly, supra, 196 Cal. at p. 555.) First, there was a stipulation Raymond was not employed at any time after Catherine's death. Second, there were answers to interrogatories in which Raymond's heirs conceded he never received any real or personal property by way of gift, devise, bequest or descent. Having eliminated every other possibility, the only tenable conclusion is Raymond's cash assets had their source in Raymond and Catherine's community property. (Cf. Estate of Jolly, supra, 196 Cal. at p. 554.)[5]
(13) Raymond's heirs object that Catherine's heirs cannot base their proof Raymond's estate derived from community property on the failure of Raymond's heirs to contend otherwise. Catherine's heirs sent the following interrogatories to Raymond's heirs and received the following answers: "INTERROGATORY NO. 11: Do you contend that at any time between the date of marriage of decedent and his predeceased wife and the date of decedent's death that he received any real or personal property by way of gift, devise, bequest or descent?
"ANSWER TO INTERROGATORY NO. 11: Not at the present time.
"INTERROGATORY NO. 13: Do you contend that any assets owned by the decedent at the time of his death had a source other than joint tenancy *1021 assets owned by his predeceased wife and himself at the time of her death, plus accumulations thereon?
"ANSWER TO INTERROGATORY NO. 13: Not at the present time.
"INTERROGATORY NO. 17: Do you contend that any of the real or personal property in which the decedent and his predeceased wife owned any interest in at the time of the death of his predeceased wife was acquired by gift, devise, bequest or descent, excluding forty acres of Iowa farm land in the name of the predeceased wife?
"ANSWER TO INTERROGATORY NO. 17: Not at the present time."
These interrogatories and answers were admitted as evidence at the hearing. Raymond's heirs made no attempt to change their answers or produce subsequently discovered facts at the hearing. By answering they did not contend Raymond's estate had a source other than the assets owned by Catherine and Raymond as joint tenants, the tracing issue was removed from the case. (Cf. Universal Underwriters Ins. Co. v. Superior Court (1967) 250 Cal. App.2d 722, 729 [58 Cal. Rptr. 870].)
The position taken by Raymond's heirs  that the proponent cannot base her case on the contentions of the opponent  is contrary to well established discovery policy and practice. The importance of "contention" interrogatories was explained by our Supreme Court in Burke v. Superior Court (1969) 71 Cal.2d 276, 280-281 [78 Cal. Rptr. 481, 455 P.2d 409]: "The discovery laws in California are designed to expedite the trial of civil matters by (1) enabling counsel to more quickly and thoroughly obtain evidence and evidentiary leads ... and (2) enabling counsel to `set at rest' issues that are not genuinely disputed. [¶] `[T]o say that "contentions" are not a proper subject of interrogatories is to subvert the whole theory of the [discovery] rules...." [¶] Accordingly, a defendant in California courts may be required through discovery to disclose not only the evidentiary facts underlying his affirmative defenses ... but also whether or not he makes a particular contention, either as to the facts or as to the possible issues in the case...." [Citations omitted; italics added.]
Obviously, a burden of proof can only exist if there is an issue of fact to be determined. Had Raymond's heirs answered the contention interrogatories affirmatively Catherine's heirs could have proceeded to discover the facts on which those contentions were based. When Raymond's heirs answered in the negative, no issue as to the source of the assets in Raymond's estate remained to be determined at the hearing. (Cf. Universal Underwriters Ins. Co. v. Superior Court, supra, 250 Cal. App.2d at p. 279.)
*1022 To summarize, we conclude Catherine's heirs met their burden of tracing the assets in Raymond's estate to community property by eliminating every other possibility. The trial court's finding of separate property is not supported by substantial evidence.

DISPOSITION
The judgment is affirmed insofar as it determines the community property portion of Raymond Luke's estate. The judgment is reversed insofar as it determines the cash assets inventoried in Raymond Luke's estate, items 1-1 through 1-7 and the uncashed check for $400 in item 1-8, to be Raymond Luke's separate property. The cause is remanded with directions to the trial court to amend its findings and issue a new judgment accordingly.
Appellant, Cynthia Maggio, is awarded costs on appeal.
Lillie, P.J., and Thompson, J., concurred.
The petition of claimant and appellant for review by the Supreme Court was denied December 2, 1987. Mosk, J., was of the opinion that the petition should be granted.
NOTES
[1] The inventory of Catherine's estate lists the value of these certificates as $121,856. However, the list of individual certificates shows some of these were acquired after Catherine's death.
[2] Unless otherwise noted all future section references are to the Probate Code.
[3] Section 229 was repealed in 1985 but continues to apply to estates of decedents who died before January 1, 1985. (§ 6414.)
[4] Given this concession, the uncashed check for $400 from the purchaser of the real estate should have been included in the court's distribution of community property. Its inclusion in Raymond's separate property was probably an oversight.
[5] Even without stipulations, concessions or inferences, $161,856 is directly traceable to community property. During the marriage Raymond and Catherine owned: $80,856 in time certificates, Calhoun County property which they sold for $52,000 a year before Catherine's death and the Carroll County property for which Raymond had received $28,000 by the time of his death. It defies common sense to assume in a five-and-a-half-year span Raymond disposed of $161,000 in community property while, at the same time, acquiring $224,722 in separate property.