Filed 3/6/26  Stone Ash v. Kettner Investments CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| STONE ASH LLC, A CALIFORNIA LIMITED LIABILITY COMPANY, et al., | D084108 |
| Plaintiffs, Cross-defendants, and Appellants, | (Super. Ct. Nos. 37-2018-00003662-CU-BT-CTL, 37-2018-00003666-CU-MC-CTL, 37-2018-00018251-CU-BT-CTL) |
| v. | |
| KETTNER INVESTMENTS, LLC, | |
| Defendant, Cross-complainant, and Respondent; | |
| MARILYN KRIEBEL, as administrator, etc., | |
| Cross-defendant and Respondent. | |

APPEALS from judgments of the Superior Court of San Diego County, James A. Mangione and Timothy Taylor, Judges.  Affirmed.

M. Cris Armenta and Maria C. Armenta, for Plaintiffs, Cross-defendants, and Appellants.

Procopio, Cory, Hargreaves & Savitch and Michael R. Kiesling, for Defendant, Cross-complainant, and Respondent.

Noonan Lance Boyer & Banach, Sean C. Coughlin, and Micaela P. Banach, for Cross-defendant and Respondent.

# I. INTRODUCTION

Michael Llamas (Michael) died in a car accident in 2017. He died intestate with his young daughter as his only heir. This litigation followed between Michael's company, his estate (the Estate), and his sister-in-law, Shannon Llamas (Shannon). Shannon claimed Michael gifted to her millions of dollars in assets for the benefit of the Llamas family. The Estate and Michael's company, now known as Kettner Investments, LLC (Kettner), claimed Shannon never owned the assets at issue and she must return them.

The matter proceeded to a bifurcated court trial on the issue of whether Michael gifted the assets to Shannon through Stone Ash, LLC, a company Michael and Kettner created and placed under Shannon's management. The superior court found Michael had not gifted the assets, and neither Stone Ash, LLC nor Shannon had any ownership interest in them. Kettner and the Estate then moved for judgment on the pleadings. The trial court granted the motions and entered judgment in their favor.

Stone Ash, LLC and Shannon appeal on three grounds. First, they contend the superior court erred by refusing to apply a presumption of ownership in their favor pursuant to Evidence Code[1] section 662, and Kettner and the Estate did not present clear and convincing evidence to rebut that presumption. Second, they argue the court erred by refusing to dismiss the claims of Kettner and the Estate based on illegality. Third, they assert

---

[1] All subsequent statutory references are to the Evidence Code unless otherwise specified.

the court erred by granting judgment on the pleadings in favor of Kettner and the Estate.  We reject each ground and affirm.

## II.  BACKGROUND

A.  *Michael, His Business Partner, and Their Companies Are Unable to Maintain Bank Accounts in Their Own Names*

Michael was the majority owner of General Hemp, LLC, a Delaware company (General Hemp), which was later consolidated into Kettner.  Through General Hemp, Michael and his partner, Stuart Titus, dealt in hemp-based products and "were in the non-psychoactive part of the cannabis industry."  Due to federal restrictions on cannabis-related products, Michael, Titus, and General Hemp had difficulty holding bank accounts in their names.

Despite these restrictions, General Hemp had a brokerage account at Wilson Davis & Company (Wilson Davis), where General Hemp held its proceeds from sales of General Hemp stock.  Withdrawing those proceeds, however, proved more difficult.  Wilson Davis would only make a transfer to a bank account held in the same name as the owner of the brokerage account.

B.  *Michael and Titus Form Stone Ash, LLC to Withdraw Their Proceeds from Wilson Davis*

With the assistance of counsel, Michael and Titus devised a way to withdraw their proceeds from the Wilson Davis account.  In August 2017, Michael and Titus changed the name of General Hemp to Stone Ash, LLC, a Delaware company.  Then they formed a separate California company, also named Stone Ash, LLC (Stone Ash).[2]  The operating agreement for the California company identified Shannon as the sole manager of the company and as holding a 100 percent membership interest.  Michael and Titus signed

---

[2]    All subsequent references to "Stone Ash" are to the California company.

a Release, Indemnity and Hold Harmless Agreement memorializing the agreement of the parties on three points: (1) they created Stone Ash for the purpose of holding funds; (2) they retained Shannon to be an officer and director and to "serve under the sole direction of Michael Llamas"; and (3) they agreed to release and indemnify Shannon from any possible claims arising from the business arrangement between the parties.

Shannon then opened a bank account for the California company at Wells Fargo Bank, naming herself as the only authorized user of the account. Meanwhile, an attorney for General Hemp notified Wilson Davis that General Hemp had changed its name to Stone Ash, LLC and requested that Wilson Davis change the company's name on the brokerage account.

C.    *Michael Directs Wilson Davis to Transfer Stock Proceeds to Stone Ash*

After Shannon opened the Wells Fargo account, Michael, through his attorney, directed Wilson Davis to send portions of the proceeds from General Hemp's stock sales to Stone Ash's bank account. Wilson Davis ultimately transferred over $9 million to Stone Ash's Wells Fargo account.

During this time, Shannon managed the money in the Wells Fargo account at the direction of Michael, who used the funds for his private use and business expenses. In addition, Shannon periodically provided accountings of the money in the Wells Fargo account to Michael and Kettner's accountant.

D.   *Michael Dies Intestate and this Litigation Results Over Assets from the Wells Fargo Account*

In November 2017, Michael died in a car accident.[3]  He did not have a will, and his only heir was his young daughter.

At the time of Michael's death, Stone Ash's Wells Fargo account held about $4.6 million.  A company in the name of Michael's father held the title to a yacht valued at $1.6 million.  The yacht had been purchased with money from the Wells Fargo account.  In January 2018, an attorney representing Michael's business interests demanded Shannon return the yacht and the money in the Wells Fargo account, which the company claimed Stone Ash had merely been holding on General Hemp's behalf.  Shannon refused to return the assets and, instead, commenced this action through the name of Stone Ash.

In the complaint, Stone Ash asserted Michael had gifted the money to Stone Ash or Shannon for the benefit of the Llamas family.  The same day, Michael's company, then operating under the name Kettner, filed a complaint against Stone Ash and Shannon for conversion, money had and received, constructive trust, and declaratory relief.  Kettner argued neither Stone Ash nor Shannon held any ownership interest in the assets, as Stone Ash had been formed for the sole purpose of holding funds for Michael and General Hemp.  With the parties' agreement the court consolidated these actions, after which Kettner filed a cross-complaint against Stone Ash and Shannon for conversion, money had and received, constructive trust, declaratory relief, receiving stolen property, and fraudulent conveyance.

---

[3]    At the time of his death, Michael was 90 percent owner of General Hemp, while Titus maintained a 10 percent interest.  After Michael's death, Titus continued to be involved in the management of General Hemp.  Titus is not part of the litigation or this appeal.

Separately, the Estate filed a complaint against Stone Ash and Shannon for breach of fiduciary duty, conversion, breach of contract, money had and received, declaratory relief, constructive trust, resulting trust, fraudulent conveyance, and accounting. Stone Ash and Shannon filed a cross-complaint against the Estate for breach of contract and fraudulent inducement, based on a claim that Stone Ash had loaned the Estate $1 million. This action also was consolidated with the complaints filed by Stone Ash, Shannon, and Kettner.

In September 2020, Kettner filed for bankruptcy, which triggered a lengthy stay of this litigation. During the pendency of the bankruptcy proceedings, Kettner and the Estate reached a settlement agreement, by which the Estate assigned to Kettner all affirmative claims the Estate had against Stone Ash and Shannon.

E. *The Matter Proceeds with a Bifurcated Court Trial as to Whether Michael Gifted the Assets*

After the bankruptcy stay was lifted, the court bifurcated this matter for trial. Phase one proceeded as a bench trial to decide the threshold claims for declaratory relief regarding whether Michael gifted the assets to Shannon and/or Stone Ash. Following the close of evidence, counsel for Stone Ash and Shannon advised the court they were no longer pressing the claim that the money was a gift. Instead, counsel asserted Michael and his companies had engaged in illegal conduct when it transferred the funds from Wilson Davis to Stone Ash and, thus, the trial court was obligated to leave the parties where it found them. Nevertheless, the court issued a ruling addressing both the issues of gift and illegality.

The court ruled that Stone Ash could not prevail on its declaratory relief claim and found the money from Stone Ash's Wells Fargo account and the yacht belonged either to Kettner or the Estate. The court also found that

6

the evidence did not establish any illegality. The court further concluded that even if the transfer of funds from Wilson Davis to Stone Ash was illegal, Shannon participated in the illegal conduct and could not receive a windfall as a result.

Before phase two of trial commenced, the Estate moved for judgment on the pleadings as to the claims Stone Ash and Shannon had filed against it. Kettner also filed a motion for judgment on the pleadings as to most of its claims against Stone Ash and Shannon. The trial court largely granted both motions. Kettner's remaining claims were later dismissed and the trial court entered judgment in favor of Kettner and the Estate. Thus, the court disposed of all claims and defenses and definitively found the assets at issue are the property of Kettner.[4]

Stone Ash and Shannon timely appealed.[5]

## III. DISCUSSION

A. *The Trial Court Did Not Commit Reversible Error in Allocating the Burden of Proof*

Stone Ash and Shannon argue the trial court applied an incorrect burden of proof at phase one of trial because it declined to apply section 662's presumption of ownership. They further argue that Kettner and the Estate did not present clear and convincing evidence to rebut section 662's presumption. We disagree.

---

[4] Because the Estate assigned all its claims against Stone Ash and Shannon to Kettner, the court's ruling against Stone Ash and Shannon necessarily resulted in a finding that the assets belong to Kettner.

[5] Stone Ash and Shannon repeatedly assert that Kettner did not file a reply brief here. They argue that they are entitled to relief as to Kettner and that Kettner has forfeited the right to oral argument. However, Kettner filed its reply brief on July 1, 2025, the deadline set by this court.

1. Additional Background

Stone Ash and Shannon argued at trial that they are the title owners of the Wells Fargo account and, thus, section 662 applies to create a presumption of ownership in their favor. They asserted that, pursuant to section 662, Kettner and the Estate bore the burden of rebutting the presumption by clear and convincing evidence.

The trial court rejected this argument in its statement of decision after phase one of trial. It found section 662 inapplicable because the bank account title was challenged as not genuine and because section 662's presumption conflicts with other statutory presumptions in this instance. It then considered whether Stone Ash and Shannon had satisfied their burden of proving Michael gifted the assets under the traditional six-element test and found they had not.

Despite first finding section 662's presumption inapplicable, the trial court also explained that, even applying the presumption, Kettner and the Estate had presented clear and convincing evidence to rebut the presumption.

2. Standard of Review

" 'We apply well-established standards of review to a judgment based upon a statement of decision issued after a bench trial. [Citation.] We review questions of law de novo and we review the trial court's findings of fact under the substantial evidence standard.' " (*Rojas v. HSBC Card Services Inc.* (2023) 93 Cal.App.5th 860, 872–873.)

We presume the trial court followed applicable law and shall affirm the judgment if it is correct on any theory, regardless of the lower court's reasoning. (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.) "Only when an error has resulted in a miscarriage of justice will it

be deemed to be prejudicial so as to require reversal.  [Citation.]  A miscarriage of justice exists if, in the absence of the error, a result more favorable to plaintiffs probably would have occurred." (*Osborn v. Mission Ready Mix* (1990) 224 Cal.App.3d 104, 114.)  The burden is on the appellant to show reversible error.  (*Patz v. City of San Diego* (2025) 113 Cal.App.5th 225, 275.)

>3.  Section 662's Rebuttable Presumption of Ownership

Both at common law and codified in section 662 is a presumption that record title reflects the full beneficial ownership interest in property.  (§ 662 ["The owner of the legal title to property is presumed to be the owner of the full beneficial title."]; *In re Marriage of Lucas* (1980) 27 Cal.3d 808, 813; *In re Marriage of Haines* (1995) 33 Cal.App.4th 277, 291.)  Section 662's presumption of ownership is inapplicable under certain circumstances.  For example, the presumption does not apply where the claimed legal title is challenged as not genuine (*Murray v. Murray* (1994) 26 Cal.App.4th 1062, 1067–1068) and where the presumption irreconcilably conflicts with a more specific applicable presumption (*Haines*, at pp. 301–302).

When section 662's presumption applies, it is rebuttable.  (§ 662.)  The party challenging the presumption of ownership, as reflected in the legal title, has the burden of rebutting the presumption with clear and convincing evidence.  (*In re Marriage of Weaver* (1990) 224 Cal.App.3d 478, 486–487.)  "The presumption can be overcome only by evidence of an agreement or understanding between the parties that the title reflected in the deed is not what the parties intended." (*In re Marriage of Brooks & Robinson* (2008) 169 Cal.App.4th 176, 189.)  Such an agreement may be inferred from the conduct of the parties.  (*Estate of Gallio* (1995) 33 Cal.App.4th 592, 596.)  " 'However, there *must* be an agreement of some sort; the presumption may

9

*not* be overcome by testimony about the hidden intention of one [party], undisclosed to the other [party] at the time of the conveyance. [Citations.]' " (*Ibid.*) Nor can the presumption be overcome merely by tracing the source of the assets used to acquire the property. (*In re Marriage of Brooks & Robinson*, at p. 190.)

Whether the party challenging section 662's presumption of ownership has rebutted that presumption by clear and convincing evidence is a question of fact for resolution by the trial court. (*Estate of Levine* (1981) 125 Cal.App.3d 701, 705.) We are bound by the trial court's factual determination if it is supported by substantial evidence. (*Ibid.*)

4. The Trial Court Did Not Commit Reversible Error with Respect to Section 662's Presumption

The parties and the trial court spent significant effort considering whether section 662's presumption of ownership applies here. But even if we accept the argument of Stone Ash and Shannon that the trial court should have applied the presumption, they cannot establish reversible error. The court ruled, in the alternative, that, even if section 662's presumption applies, Kettner and the Estate presented clear and convincing evidence to rebut the presumption of ownership. That finding is supported by substantial evidence.

a. The Record Shows the Parties Had an Express Agreement that Stone Ash Was Formed to Hold Funds on Behalf of General Hemp

The Release, Indemnity, and Hold Harmless Agreement (the Release) expressly states: "Michael Llamas, Stuart Titus, and General Hemp, LLC . . . ; and Shannon Llamas . . . [¶] . . . [¶] desire to form and operate . . . Stone Ash, LLC for the purpose of holding funds," and Shannon, as director of Stone Ash, was to "serve under the sole direction of Michael

10

Llamas." This language clearly expressed the agreement between all parties that Stone Ash was formed for the purpose of holding funds for Michael and General Hemp. Importantly, the express agreement reflected in the Release is consistent with past dealings between Michael and Shannon. Like the arrangement at issue here, Shannon was designated a nominal member in one of Michael's companies called Seaside Sales & Marketing. Yet, she acknowledged at trial she had no ownership interest in Seaside.

Stone Ash and Shannon argue the Release is ambiguous because it states only that the purpose for forming Stone Ash was to "hold[] funds," but it did not specify on whose behalf it was holding funds. They contend this ambiguity was not resolved at trial because the trial testimony conflicted as to whether "the purpose [of forming Stone Ash] was for the Llamas Family to invest and grow" or if Shannon was merely a "nominee" to hold funds on behalf of General Hemp. They argue that, considering the ambiguity, the Release should be interpreted against General Hemp, whose lawyer drafted it.

The Release is not ambiguous. It clearly states Michael, his business partner, and their company created Stone Ash to hold funds. It further states Shannon was to "serve under the sole direction of Michael Llamas." There is no basis on which to interpret this agreement to mean that Michael, his business partner, and their company intended to act together to form a new entity that would operate under the sole direction of Michael, but that the purpose of the entity was for some implied purpose of benefiting only Michael's family. Rather, the Release clearly memorializes the agreement of the parties to form Stone Ash for the purpose of holding funds for Michael and General Hemp.

11

b.  The Parties' Conduct Showed It Was Not Their Intent for Shannon and/or Stone Ash to Enjoy Any Ownership Interest in the Assets

In addition, the conduct of the parties supports a finding that they never intended for Shannon to enjoy any ownership interest in the assets. For example, all the deposits identified in the record that went into the Wells Fargo account came from the proceeds of selling General Hemp's stock. In addition, Michael gave directions to Shannon as to the use of the funds in the Wells Fargo account, generally allocating the funds for his personal and business expenses. Shannon then provided accounting of the Wells Fargo account to Michael's accountants.

In the face of this evidence, Stone Ash and Shannon only argue that Shannon exercised control over the money. They support this argument with reference to Shannon's testimony that she refused Michael's request to use money from the Wells Fargo account to buy a second yacht and property in Detroit. However, the evidence, including Shannon's own testimony, does not show Michael demanded Shannon purchase these things and she refused. Rather, it shows she and Michael collaborated on whether to make these investments and Shannon concluded they were not wise business decisions. This does not show Shannon was exerting control over the money in the Wells Fargo account independent from Michael's authority.

Ultimately, the parties' express agreement and their conduct show their intent was to form Stone Ash for the purpose of holding money for Michael and General Hemp, not to give the assets to Stone Ash or Shannon. Thus, substantial evidence supports the trial court's conclusion that, if section 662's presumption applies, Kettner and the Estate had rebutted the presumption by clear and convincing evidence.

## 5. Stone Ash and Shannon Have Not Challenged the Trial Court's Ruling Regarding a Gift Under the Six-Element Test

Because the trial court properly found that, even if section 662 applied, Kettner and the Estate had rebutted its presumption of ownership by clear and convincing evidence, the analysis then reverted to the question of whether Stone Ash and Shannon had established a gift under the traditional six-element test described in *Burkle v. Burkle* (2006) 141 Cal.App.4th 1029, 1036, footnote 5. Stone Ash and Shannon do not contest the trial court's finding under the six-element test that Michael did not gift the assets. Accordingly, they have forfeited any challenge, and we accept the trial court's finding under the six-element test that Michael did not gift the assets to Stone Ash and Shannon. (*Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 518 ["By not raising this in its opening brief, the County has forfeited the point."].)

For these reasons, we find the trial court did not err with respect to the allocation of the burden of proof.

B. *The Trial Court Did Not Err by Failing to Dismiss Any Claims for Illegality*

Next, Stone Ash and Shannon argue the trial court erred by denying their request to dismiss Kettner's claims based on their engagement in illegal conduct.[6] Stone Ash and Shannon assert that the business arrangement at issue here was premised on a scheme to deal in illegal cannabis products, defraud Wilson Davis, and launder money because Michael, Titus, and

---

[6] Stone Ash and Shannon argue the trial court erred by failing to dismiss the claims of both Kettner and the Estate for illegality. But the Estate assigned all its claims to Kettner and, thus, there remained no claims by the Estate against Stone Ash and Shannon for dismissal.

13

General Hemp were unable to hold bank accounts due to their involvement in the cannabis industry. We find no error.

1. Additional Background

In her closing arguments at phase one of trial, counsel for Stone Ash and Shannon encouraged the trial court "not to consider the gift issue" but, rather, to find in their favor because Michael and Kettner had been involved in an illegal scheme to pull money out of their brokerage account and place it in an account that did not belong to them. In its statement of decision, the trial court explained that "no illegal transaction was proven" at phase one because the parties had not sought declaratory relief on this basis and Stone Ash and Shannon had been tardy in raising the illegality defense. It further found that illegality was not a defense to the "theft-based claims currently being asserted" and only applied to "contract enforcement actions." Finally, the court found that Stone Ash and Shannon participated in any alleged illegality and accepting their illegality argument would result in an improper windfall in their favor.

Following phase one, Stone Ash and Shannon filed a motion before the then-assigned judicial officer, again raising the issue of illegality. The court declined to hear the issue. Thereafter, the trial court largely granted motions by Kettner and the Estate for judgment on the pleadings. Stone Ash and Shannon then once again moved to dismiss based on illegality. The trial court denied the motion, finding the issue had already been decided in the court's statement of decision following phase one.

2. The Trial Court Did Not Err by Rejecting Appellants' Illegality Arguments

In California, a contract must have "a lawful object," or it is void. (Civ. Code, § 1550, subd. (3); see Civ. Code, §§ 1441, 1596, 1598, 1608.) "[A]n illegal contract 'may not serve as the foundation of any action, either in law

14

or in equity' [citation], and . . . when the illegality of the contract renders the bargain unenforceable, ' "[t]he court will leave [the parties] where they were when the action was begun." ' " (*Kashini v. Tsann Kuen China Enterprise Co.* (2004) 118 Cal.App.4th 531, 541.) " 'Whether a contract is illegal . . . is a question of law to be determined from the circumstances of each particular case.' " (*Timney v. Lin* (2003) 106 Cal.App.4th 1121, 1126; see also *Kashini*, at p. 540.)

Although a court may not aid in the enforcement of an illegal contract, neither will a court allow a party to be unjustly enriched based on the defense that an illegal act in which the party also participated must not be enforced. (See, e.g., *Aghaian v. Minassian* (2021) 64 Cal.App.5th 603, 622.)

First, Stone Ash and Shannon have not established the threshold element of the doctrine of illegality on which they rely, i.e. the attempted enforcement of a contract. The material claims at issue here are Kettner's claims of conversion, money had and received, constructive trust, and breach of fiduciary duty. These are the claims on which the trial court granted judgment on the pleadings in favor of Kettner and resulted in the ultimate entry of judgment against Stone Ash and Shannon following the dismissal of Kettner's remaining claims. But none of these causes of action involved a contract between the parties, let alone a contract that was illegal or contemplated illegal action.

Second, if Michael and/or his companies engaged in any illegal activity by transferring funds to the Wells Fargo account, Stone Ash and Shannon were equally culpable. Shannon participated in the formation of Stone Ash, opened the Wells Fargo account, and, at Michael's direction, managed the money transferred to the Wells Fargo account for Michael's benefit. And, when Shannon opened the Wells Fargo account, she provided false

15

information about Stone Ash's purpose and revenue. To allow Stone Ash and Shannon to retain millions of dollars the parties never intended for them to own, based on an allegedly illegal relationship in which they all willingly participated, would result in improper unjust enrichment.

Stone Ash and Shannon have failed to show the trial court erred by refusing to dismiss Kettner's claims because of illegality.

C. *The Trial Court Did Not Err by Granting Respondents' Motions for Judgment on the Pleadings*

Lastly, Stone Ash and Shannon argue the trial court erred by granting motions for judgment on the pleadings brought by both Kettner and the Estate. They argue the court's decision at the first phase of trial disposed of the competing declaratory relief claims regarding the issue of a gift, but it was not determinative of the remaining disputes between the parties. We disagree.

1. Additional Background

Following the court's decision after phase one, Kettner moved for a judgment on the pleadings as to its claims against Stone Ash and Shannon for conversion, money had and received, constructive trust, breach of fiduciary duty, and fraudulent conveyance. The trial court granted Kettner's motion, except as to the fraudulent conveyance claim. In doing so, the court found that the decision after phase one was sufficient to satisfy each of the elements of Kettner's causes of action on which the motion was granted.

The Estate also moved for judgment on the pleadings as to the breach of contract and fraudulent inducement claims Stone Ash and Shannon brought against it. The court granted the Estate's motion in its entirety. The court explained that both causes of action against the Estate required a showing of damages, which was foreclosed by the finding at phase one that neither Stone Ash nor Shannon had any ownership interest in the assets.

16

2. Standard of Review

A plaintiff may move for judgment on the pleadings on the ground "that the complaint states facts sufficient to constitute a cause or causes of action against the defendant and the answer does not state facts sufficient to constitute a defense to the complaint." (Code Civ. Proc., § 438, subd. (c)(1)(A).) A defendant may move for judgment on the pleadings on the ground that "[t]he complaint does not state facts sufficient to constitute a cause of action against that defendant." (*Id.*, subd. (c)(1)(B)(ii).)

"The trial court's judgment on the order granting a motion for judgment on the pleadings is reviewed independently under the de novo standard of review." (*International Assn. of Firefighters, Local 230 v. City of San Jose* (2011) 195 Cal.App.4th 1179, 1196.) In conducting this review, "we treat the properly pleaded allegations of [the] complaint as true . . . . [Citations.] 'Moreover, the allegations must be liberally construed with a view to attaining substantial justice among the parties.' " (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1232.) For purposes of a motion for judgment on the pleadings, " '[i]ssues adjudicated in earlier phases of a bifurcated trial are binding in later phases of that trial and need not be relitigated." ' " (*Orange County Water Dist. v. Alcoa Global Fasteners, Inc.* (2017) 12 Cal.App.5th 252, 359).

3. The Trial Court Properly Granted the Motions

a. Conversion

" ' "Conversion is the wrongful exercise of dominion over the property of another. The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages." ' " (*Hester v. Public Storage* (2020) 49 Cal.App.5th 668, 680.) " '[T]here can be no

17

conversion where an owner either expressly or impliedly assents to or ratifies the taking, use or disposition of his property.' " (*Berry v. Frazier* (2023) 90 Cal.App.5th 1258, 1271.)

Stone Ash and Shannon argue the trial court should not have granted Kettner's motion for judgment on the pleadings as to the conversion claim because the trial court's phase one decision was not dispositive as to whether Kettner consented to Stone Ash and/or Shannon taking of the assets. Not so.

In its phase one decision, the trial court found neither Stone Ash nor Shannon had any ownership interest in the assets. It also highlighted the evidence showing Stone Ash and Shannon did not take possession of the assets for their own purposes. For example, the court found Michael formed Stone Ash for the purpose of holding money for himself and General Hemp, not for the purpose of allowing Stone Ash and/or Shannon to take possession of the money. In addition, the court found the money was never "deliver[ed]" to Stone Ash or Shannon, and "Shannon did not accept the funds unconditionally as a gift, but rather agreed to 'hold' them and disburse or otherwise handle them 'under the sole direction of Michael Llamas.' " The court also stated "[t]here is no writing of any type, including any email or text, in which anyone, including [Shannon], refers to the money as" being Shannon's or the Llamas family's money. Lastly, it found "that from the date he caused Stone Ash California to be formed until his death, Michael Llamas maintained actual and complete control over Stone Ash California (and the money in the Wells Fargo Accounts)." As a result of these findings, the trial court's phase one decision necessarily concluded that neither Michael nor any of his companies consented to Stone Ash and/or Shannon taking possession of the assets for their own purposes.

18

The trial court properly granted Kettner's motion for judgment on the pleadings as to this claim.

### b. Money Had and Received and Constructive Trust

As to Kettner's claims for money had and received and constructive trust, Stone Ash and Shannon argue only that the trial court's phase one decision did not dispose of their affirmative defenses and, thus, judgment on the pleadings was improper as to these claims. As explained *post*, Stone Ash and Shannon have not sufficiently pleaded their arguments with respect to these affirmative defenses.

### c. Breach of Fiduciary Duty

"The elements of a cause of action for breach of fiduciary duty are: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach." (*Jones v. Goodman* (2020) 57 Cal.App.5th 521, 526, fn. 3.) As to the first element, the trial court's phase one decision found that "Shannon . . . agreed to 'hold' [the money in the Wells Fargo account] and disburse or otherwise handle them 'under the sole direction of Michael Llamas.'" It further found that Stone Ash and Shannon did not maintain any ownership interest in the disputed assets. As to the second and third elements, Stone Ash and Shannon do not dispute that they refused to return the assets as demanded. Thus, they breached the fiduciary duty and caused damage to the owners. As each element of Kettner's claim for breach of fiduciary duty was met, the trial court properly granted judgment on the pleadings as to this claim.

### d. Breach of Contract and Fraudulent Inducement

As relevant here, the causes of action for breach of contract and fraudulent inducement each require a showing of damages. (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820–821.)

19

The claims Stone Ash and Shannon brought against the Estate for breach of contract are premised on their theory that when they transferred $1 million to the Estate from the Wells Fargo account, it was merely a loan made after the Estate promised to marshal Michael's assets for the benefit of his daughter.

Here, Stone Ash and Shannon do not address each of the elements of the substantive claims at issue. Rather, they argue only that the phase one decision settled the issue of whether Michael gifted the money to Stone Ash and/or Shannon, not the issue of ownership. In doing so, they appear to challenge the trial court's finding that they could not show damages for purposes of their claims against the Estate because they did not have an ownership interest in the money. Stone Ash and Shannon are mistaken regarding the trial court's finding of ownership.[7]

In its decision at phase one, the trial court found that Michael did not gift the money in the Wells Fargo account to Stone Ash and/or Shannon and, thus, they did not have an ownership interest in the money. Because the trial court concluded that neither Stone Ash nor Shannon owned the money it purportedly loaned to the Estate, they cannot show they suffered any damages resulting from the Estate's alleged failure to comply with the terms of the purported loan. Thus, the trial court properly granted judgment on the pleadings against Stone Ash and Shannon as to these claims.

---

[7]    It is true that, in ruling on the motions for judgment on the pleadings, the trial court did not decide who owned the assets as between Kettner and the Estate. However, this is not material to the claims Stone Ash and Shannon brought against the Estate, as the trial court clearly decided neither Stone Ash nor Shannon had any ownership interest in the assets at issue. And, again, the Estate assigned all its affirmative claims to Kettner, so any finding of ownership as between the Estate and Kettner necessarily was a finding that Kettner owned the assets.

e. Affirmative Defenses

Lastly, the argument of Stone Ash and Shannon that the trial court improperly granted the motions for judgment on the pleadings without considering their affirmative defenses is unpersuasive.

As to the Estate's motion, the trial court granted judgment on the pleadings with respect to the claims Stone Ash and Shannon brought against the Estate. Any affirmative defenses Stone Ash and Shannon had as to claims brought against them are not relevant to the claims they brought against other parties. Thus, they cannot show any trial court error resulting from a failure to consider alleged affirmative defenses as to the Estate.

As to Kettner's motion, Stone Ash and Shannon argue the trial court erred by failing to consider their affirmative defenses with respect to Kettner's claims for money had and received and constructive trust. With respect to these claims, Stone Ash and Shannon argue "a jury could determine" Kettner waived any claim to the money in the Wells Fargo account, had unclean hands related to how it obtained the money, and its failure to request the return of the money before Michael's death resulted in laches.

Stone Ash and Shannon do not state what evidence supports their affirmative defenses but rather make conclusory assertions that a jury could have found in their favor on these defenses. " 'In order to demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record. Rather than scour the record unguided, we may decide that the appellant has waived a point urged on appeal when it is not supported by accurate citations to the record. [Citations.] Similarly, we may disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by

21

which the appellant reached the conclusions he wants us to adopt.' " (*Slone v. El Centro Regional Medical Center* (2024) 106 Cal.App.5th 1160, 1172.) Stone Ash and Shannon attempt to remedy their insufficient assertions by augmenting their arguments in the reply brief. We decline to consider their arguments improperly raised for the first time in their reply. (*Committee to Relocate Marilyn v. City of Palm Springs* (2023) 88 Cal.App.5th 607, 636, fn. 8.) Ultimately, the conclusory assertions regarding affirmative defenses are insufficient to establish reversible error.

Stone Ash and Shannon have not established any error with respect to the trial court's rulings on the motions for judgment on the pleadings.

IV.  DISPOSITION

The judgments are affirmed. Costs on appeal are awarded to respondents Kettner Investments, LLC and Marilyn Kriebel, as administrator of the Estate of Michael R. Llamas.

RUBIN, J.

WE CONCUR:

O'ROURKE, Acting P. J.

DATO, J.

22